ERVIN COHEN & JESSUP, LLP
Matthew S. Blum, Esq. - MBlum@ECJLaw.com
Sarah E. Silbowitz, Esq. - SSilbowitz@ECJLaw.com
1185 Avenue of the Americas, 3rd Floor
New York, NY 10036
(212) 224-0644

ERVIN COHEN & JESSUP, LLP
Russell M. Selmont, Esq.- RSelmont@ECJLaw.com *(Pro Hac Vice to be filed)*
9401 Wilshire Boulevard, 12th Floor
Beverly Hills, CA 90212
(310) 273-6333

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOUGLAS KIM, individually and on behalf of others similarly situated, Plaintiffs, | Case No.: 1:26-cv-7307 |
| -against- | **CLASS ACTION COMPLAINT** |
| LEDGER SAS Defendant. | |

Plaintiff Douglas Kim ("Kim") brings this class action lawsuit, individually and on behalf of all others similarly situated (collectively, "Plaintiffs"), against Defendant Ledger SAS ("Ledger" or "Defendant") for its failure to adequately safeguard its customers' personally identifiable information ("PII") and cryptocurrency security data, and for its failure to timely disclose a massive data breach that exposed such information to malicious actors on the dark web. Plaintiff pleads on information and belief:

## INTRODUCTION

1. This class action lawsuit arises from Defendant's pattern of inadequate safeguarding of customer PII, in particular arising from a security incident that occurred in December 2023 (the "Data Breach"). Failing to notify its customers at and after the Data Breach, as well as Ledger's inadequate security safeguards, and choice to conceal its infiltrated systems,

resulted in unauthorized individuals compromising Defendant's software-distribution controls to induce Ledger customers into approving fraudulent cryptocurrency transactions, theft of customer PII for the purposes of committing, for e.g., identity theft, financial theft, and other crimes. Ledger's inadequate security and decisions to conceal breaches to its systems are well documented, evidenced by the Data Breach, by Defendant's prior 2020 data breach described in ¶¶9–10, and by the impersonation scheme described in Section E below, which together, upon information and belief, caused substantial class-wide damages. The injury and damages were incurred as a direct and proximate result of Ledger's recklessness and negligence.

2. Defendant Ledger is a leading international manufacturer of hardware wallets, which are devices that are designed to securely store digital cryptocurrencies and cryptoassets and prevent hacking by cybercriminals and access via the internet.

3. Defendant started its business in the cryptoasset-blockchain industry in 2014 and has since expanded exponentially into a worldwide powerhouse in the crypto industry.

4. Ledger has sold 7 million units, has customers in 180 different countries, and has more than 100 resellers of its products.

5. Ledger also has 700 employees across 8 offices, including in New York City, Paris, Vierzon, London, Portland, Singapore.

6. Ledger holds itself out as a premier provider of secure cryptocurrency services and routinely advertises itself an industry leader in secure crypto-currency storage and consumer privacy.

7. Despite Defendant's electronic and security-centric business and its public representations, hackers were able to access and utilize the personally identifiable information (PII) of Defendant's customers during the Data Breach, including their names, email addresses, phone numbers, and other sensitive information.,

8. Before, during, and after the Data Breach, Ledger has demonstrated a disturbing pattern of negligent, reckless, and irresponsible behavior with regard to its security posture and a callous disregard for its obligations to the privacy of its customers' PII.

9. Most notably, the Data Breach comes on the heels of a prior significant data breach experienced by Ledger, which only occurred a few years earlier, in 2020, and is alleged to have affected more than 270,000 of Defendant's customers with their names, physical addresses, phone numbers, and other personally identifiable information becoming available on the internet's black market.[1]

10. In the aftermath of both data breaches, it has become apparent that Ledger will not rectify and bolster its inadequate security measures to prevent data breaches and protect the PII of its consumers, who have trusted and relied upon Ledger to safeguard their sensitive information.

11. Second, and perhaps more astounding and egregious, in the days and months following the Data Breach, Ledger failed to sufficiently alert, and then downplay, the Data Breach to its customers and the public. This is precisely what Ledger did in the aftermath of the 2020 data breach.

12. In particular, after the Data Breach, Ledger failed to timely and completely disclose the incident, and the scope of its customer data exposed to affected consumers. Upon information and belief, cybercriminals thereafter used customer contact information originating from the Data Breach to contact customers, impersonate Ledger representatives, and fraudulently obtain access to customers' cryptocurrency wallets and private keys, resulting in substantial financial losses that would have been prevented, or that class members would have been able to guard against, had Ledger taken responsible and complete steps to notify its customers. But it did not.

13. Defendant's failures run afoul of federal and state consumer protection laws, and give rise to claims for violations of New York's General Business Law §§ 349 and 350, Negligence, Negligent Misrepresentation, Promissory Estoppel, and Breach of the Covenant of Good Faith and Fair Dealing.

---

[1]The 2020 Ledger data breach is being litigated in the Northern District of California, bearing caption, Naeem Seirafi, et al., v. Ledger SAS, Case No. 3:21-cv-02470-EMC.

## THE PARTIES

14. Plaintiff Douglas Kim is an individual residing in Los Angeles, California.

15. Upon information and belief, Defendant Ledger SAS is a French simplified joint-stock company which maintains offices at 214 West 29th Street, 6th Floor, New York, New York 10001-5330.

16. Defendant Ledger has maintained its New York City office since 2018, according to a Ledger press release, Ledger Expands to New York City, Appoints Demetrios Skalkotos As Head of Ledger Vault, dated November 26, 2018.[2]

17. Upon information and belief, Defendant conducts substantial business in New York and maintains customers in New York.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under the Class Action Fairness Act, codified under 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and at least one class member is a citizen of New York State and Defendant is a citizen of a foreign state.

19. This Court has personal jurisdiction over Defendant Ledger SAS because Ledger conducts substantial business in the State of New York, including maintaining an office and employees in New York City, thereby availing itself of the privilege of conducting business within this State and invoking the benefits and protections of its laws.

20. Pursuant to FRCP (4)(k), this Court this Court's jurisdiction is co-extensive with any state court in the same district which exercises long-arm jurisdiction over a defendant. Pursuant to New York Civil Practice and Rules § 302 (a) (3), this Court maintains in-personam

[2]https://www.ledger.com/ledger-expands-to-new-york-city-appoints-demetrios-skalkotos-as-global-head-of-ledger-vault

jurisdiction over Defendant because it committed a tort within New York that caused injury to persons and property within the State of New York.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendant maintains a business presence in New York City which is within this judicial district.

22. Additionally, venue is further proper pursuant to 28 U.S.C. § 1391(b)(3) as Defendant is subject to the Court’s personal jurisdiction with respect to this action within this District.

23. Upon information and belief, Defendant is a corporation organized under the laws of France, with its principal place of business in France but with a United States headquarters in New York, New York.

24. Upon information and belief, Defendant maintains a physical office in New York City, located at 214 West 29th Street, 6th Floor, New York, New York 10001-5330, through which it conducts ongoing business operations.

25. Upon information and belief, Defendant purposefully directs its activities toward New York and has established continuous and systematic contacts within the forum. Defendant utilizes its New York City office to, inter alia, market its products and services, enter into agreements with consumers, and support and foster its business and consumer relationships, including its relationship with Plaintiffs.

26. Upon information and belief, Defendant regularly ships goods to and from New York, including the shipment of goods related to the transactions at issue in this class action.

27. Upon information and belief, Defendant conducts significant business in New York and derives substantial revenues from its business dealings in New York which concerns interstate commerce.

28. This Court further has personal jurisdiction over all parties because Plaintiff Kim purchased the Ledger wallet in question in New York, he was injured as a direct and proximate

result of Defendant's actions, and the class action claims arise out of consumer purchases of Ledger wallets, among other places, in New York.

29. Defendant also maintains a company website that is interactive and is accessible to and used by consumers in New York. In particular, upon information and belief, Defendant utilizes its website to advertise to consumers, solicit business, make representations to consumers about its products and its security capabilities, sell its products and services, enter into agreements with consumers, collect personally identifiable consumer information, and communicate with consumers, all within the State of New York.

30. In the alternative, this Court has personal jurisdiction over Defendant pursuant to New York Civil Practice and Rules § 302 (a)(3) because Defendant committed tortious acts outside of New York that caused injury to Plaintiff within New York and because Defendant regularly transacts and solicits business in New York, derives substantial revenue from its interstate and international transactions with the State of New York, such that Defendant expects and should reasonably expect to have consequences in this forum.

31. This Court's assertion of personal jurisdiction over Defendant is reasonable and consistent with notions of fair play and substantial justice under the Due Process clause of the United States Constitution because Defendant has sufficient minimum contacts with New York as a result of its continuous physical presence in New York and its continuous commercial transactions and dealings with New York consumers and businesses.

## FACTUAL ALLEGATIONS

### A. Cryptocurrencies and Cryptoassets.

32. Cryptocurrencies and cryptoassets are digital assets that are designed to act as a method of currency or a storage of value. They rely upon a variety of cryptographic principles to secure transactions.

33. Every blockchain address has both a public key and a private key.

34. The keys allow the holder to control the cryptocurrency corresponding to that particular blockchain address and receive crypto from other people.

35. The management and safeguarding of crypto-keys is crucial to securely storing and maintaining cryptoassets.

36. The public key is similar to a bank account number. Anyone can send or wire money using a bank account number, but they cannot control the funds with that number or withdraw those funds. A public key does not give others access to the crypto at the blockchain address. It is purely an address that receives assets.

37. A private key grants users access to manage the crypto funds at a specific address. While the public key is like a bank account number, the private key is more like a PIN number or password. It gives the crypto holder access to the blockchain address and the funds.

38. Once the private key is disclosed or obtained, a bad actor can implement an untraceable transfer of the cryptoasset from the owner's digital address to another digital address.

39. In short, anyone with access to the private key can exercise complete and unfettered control over the cryptoasset. Whoever has access to it can control and spend the cryptocurrencies at the address.

40. The private key must be maintained extremely securely offline from web browsers and other platforms.

41. One way to avoid disclosure of a private key, is to obtain a hardware "wallet". A hardware wallet is a physical device that allows the crypto holder to manage cryptocurrencies while keeping the private keys offline.

42. Hardware wallets avoid online hacks as they remain disconnected from the internet.

**B. Ledger's Mandatory Collection of Consumer PII and its Representations of a Secure Network and Protocols to Protect PII.**

43. In order for a consumer to receive Ledger's services and products, like the hardware wallet, Ledger requires consumers to enter into agreements with it, including but not limited to, the Ledger General Sales Terms and Conditions the Ledger Privacy Policy.

44. Ledger also collects and stores "personal data" from its customers and "information that makes it possible to identify you [the consumer]", before consumers can received Ledger's services and products.[3]

45. Among the types of information that Ledger collects, are:

(a) Name;

(b) Email address;

(c) Delivery address;

(d) Phone number;

(e) Type of product purchased;

(f) Delivery method;

(g) Payment method and details;

(h) Order amount; and

(i) Currency.[4]

46. Defendant routinely advertises and holds itself out as a secure custodian of user data and assets.

47. For example, Ledger has referred to itself as the "Cryptocurrency Security Leader" in one of its press releases on its website.[5]

48. Ledger also devotes an entire section on its website its purported mission, which provides "OUR MISSION IS TO SECURE YOUR DIGITAL LIFE", under which it makes statements like "Security is and will remain at the heart of our products" and "Today, we are primarily known for being a secure gateway to crypto and NFTs."[6]

[3]https://www.ledger.com/privacy-policy
[4]https://www.ledger.com/privacy-policy
[5]https://www.ledger.com/ledger-expands-to-new-york-city-appoints-demetrios-skalkotos-as-global-head-of-ledger-vault
[6]https://www.ledger.com/blog/we-are-ledger-a-brand-vision (emphasis in original).

49. Ledger also purports to have "The best security" and repeatedly acknowledges the risk that unauthorized access to data and information can have on customers, explaining that "Our Solution leverages end-to-end hardware security with 100% self custody. Customers have no exposure to third parties and can recover all assets in an emergency . . . This means no exposure to third parties and the best protection against hacks, internal collusion, and human errors."[7]

50. Further, Ledger acknowledges that digital data and information can be stolen in an instant ("This Revolution of Value is changing the world, but the bankruptcies of high-profile centralized entities have shown that when they control your digital assets, you can lose them in a finger snap. In this new era, owning and securing your value is more important than ever. This is where we come in. We are Ledger.")[8]

51. Ledger also devotes a section of its website for how it maintains customer information, titled "How Do We Keep Your Data Secure" and represents that "We implement all technical and organisational measures we deem necessary to safeguard your Data at an appropriate level of security, including:

(a) Payment information security: your payment information is encrypted using a secure commercial Internet protocol (TLS) and is never stored on our server.

(b) An awareness programme and employee training.

(c) Encryption during exchanges and storage.

(d) Regular audits of data hosting companies.

(e) Data redundancy for more resilience in the event of catastrophe.

(f) Role-based authentication.

(g) Two-factor authentication for our authorised contributors.

(h) Continuous monitoring of the system.

[7]https://enterprise.ledger.com/tradelink-custodians
[8]https://www.ledger.com/blog/we-are-ledger-a-brand-vision

(i) Security assessments in line with industry standards.

(j) Security tests and intrusion tests by independent third parties.[9]

## C. Ledger's Data Security Obligations

52. Ledger has contractual and common law obligations to ensure the safety and security of the information that it requires customers to submit.

53. In addition, Ledger is bound by certain federal and state laws requiring it to maintain the security and privacy of PII that it stores on its network.

### (1) The Federal Trade Commission Act

54. The Federal Trade Commission ("FTC") is an agency of the United States government whose principal mission is, inter alia, to promote consumer protection.

55. The Federal Trade Commission Act ("FTC Act") is the primary statute of the FTC.

56. Section 5(a) of the FTC Act, codified at 15 USC §45 and entitled Unfair or Deceptive Acts or Practices, prohibits "unfair or deceptive acts or practices in or affecting commerce."

57. This prohibition applies to all persons and businesses engaged in commerce.

58. When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up their representations and promises. Among the various enforcement proceedings that the FTC has brought, are legal actions against organizations that have violated consumers' privacy rights or misled them by failing to maintain security for sensitive consumer information and causing substantial consumer injury.

59. The FTC routinely commences actions against business that fail to adequately and reasonably safeguard consumer data and PII, and as the FTC considers that the failure to do so is an unfair act or practice under the FTC Act.

[9] https://www.ledger.com/privacy-policy

60. In addition to investigating issues involving consumer issues, developing rules to maintain a fair marketplace, and commencing and maintaining legal actions to protect consumers, the FTC provides guidelines to companies to assist them with ensuring the security of confidential customer information.

61. For example, the FTC has authored a publication, "Protecting Personal Information: A Guide for Business".[10]

62. With regard to electronically stored personal information is stored, the FTC has opined that "What's the best way to protect the sensitive personally identifying information you need to keep? It depends on the kind of information and how it's stored. The most effective data security plans deal with four key elements: physical security, electronic security, employee training, and the security practices of contractors and service providers."[11]

63. Among the suggestions that FTC offers to maintain the security of personal information, are to:

(a) Train employees about company policies regarding keeping information secure and confidential;

(b) Establish procedures to ensure that terminated employees no longer have access to sensitive information, by doing things like terminating their log in credentials as part of the offboarding process;

(c) Train employees to recognize security threats and suspicious activity, such as the dangers of spear phishing - i.e., emails that look legitimate but contain malicious links designed to obtain confidential information and release harmful codes - and how to report them;

(d) Create a "culture of security" by implementing a regular schedule of employee training; and

(e) Impose disciplinary measures for security policy violations.[12]

[10]https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business
[11]https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business
[12]https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

64. The FTC also instructs business to notify consumers and any affected and interested parties immediately after a data breach occurs.

65. In particular, businesses should immediately notify local law enforcement about the breach and the potential for identity theft as well as the appropriate local office of the Federal Bureau of Investigation or the Postal Inspection Office.

66. Businesses should also designate a point person within the organization who can be contacted, who has the latest information about the breach and the company's response, advise consumers on what steps they can take, and explain:

(a) How it happened;

(b) What information was taken;

(c) How the criminals have used the information (if known);

(d) What actions the company has taken to remedy the situation;

(e) What actions the company is taking to protect consumers (e.g., free credit monitoring services; and

(f) How to reach relevant contacts in the organization.

67. The foregoing enables consumers to take steps to reduce the chance that their information will be misused.

**(2) <u>The New York SHIELD Act</u>**

68. Because Ledger conducts business in the State of New York and maintains computerized data containing the private information of New York State residents, it is required to comply with New York's Stop Hacks and Improve Electronic Data Security Act (the "SHIELD Act").

69. Codified at New York General Business Law §§ 899-AA and 899-BB, the SHIELD Act requires Ledger to devise and implement administrative, technical, and physical safeguards to ensure the security of an individual's private information.

70. The SHIELD Act further provides:

> Any person or business that owns or licenses computerized data which includes private information of a resident of New York shall develop, implement and maintain reasonable safeguards to protect the security, confidentiality and integrity of the private information including, but not limited to, disposal of data. NY GBL § 899-BB (2).

71. The SHIELD Act further provides that reasonable administrative safeguards include:

(a) designating one or more employees to coordinate the security program;

(b) identifying reasonably foreseeable internal and external risks;

(c) assessing the sufficiency of safeguards to control the identified risks;

(d) training and managing employees in security practices and procedures;

(e) selecting service providers capable of maintaining appropriate safeguards;

(f) requiring service providers to maintain safeguards by contract; and

(g) adjusting the security program to business changes or new circumstances.

NY GBL § 899-BB (2) (ii).

72. In the event of a data breach, companies subject to the SHIELD Act are required to notify every New York resident whose private information was, or is reasonably believed to have been, accessed or acquired by a person without valid authorization upon the company's discovery of the breach.

73. Such notice must be issued "in the most expedient time possible and without unreasonable delay," and in no event later than thirty days after the breach was discovered.

74. Companies are also required to send notice of any data breach to the New York State Attorney General, the New York Department of State, the New York Division of State Police, and to consumer reporting agencies.

75. In the event that any New York residents are to be notified of a data breach, companies like Ledger are also required to notify the New York State Attorney General, the New York Department of State, and the New York Division of State Police, as to the timing, content

and distribution of the notices and approximate number of affected persons and shall provide a copy of the template of the notice sent to affected persons.

76. In the event that more than five thousand New York residents are required to be notified at one time, the breached business is also required to notify consumer reporting agencies as to the timing, content and distribution of the notices and approximate number of affected persons.

77. Any person or business that fails to comply with NY GBL § 899-BB (2) "shall be deemed to have violated New York General Business Law § 349."

**D. <u>The Data Breach</u>**

78. On or about December 14, 2023, Defendant experienced a security incident in which unauthorized individuals compromised the NPMJS account used to publish and distribute the Ledger Connect Kit software library and redirected certain users' cryptocurrency transactions to wallet addresses controlled by the attackers by inducing malicious transaction approvals.

79. The Data Breach originated from cybercriminals who accessed the NPMJS account of a former Ledger employee through a phishing attack.[13]

80. Despite the termination of the former Ledger employee's employment, Ledger negligently failed to immediately revoke that employee's access to the NPMJS account.

81. Ledger admitted this in a public statement, wherein it stated, "unfortunately the former employees' access to NPMJS was not properly revoked" and acknowledged that the failure to ensure the termination of the former employee's access was a departure from Ledger's existing and regularly updated offboarding procedure.[14]

82. Once the cybercriminals gained access to the former employee's account, they leveraged the former employee's access to upload a malicious version of the Ledger Connect Kit library, which is a tool that allows hardware wallets to connect to web browsers and other platforms.

[13]NPMJS is a platform for developers that hosts code packages.
[14]Security Incident Report | Ledger. https://www.ledger.com/blog/security-incident-report

83. Ledger has publicly admitted that the Data Breach "trick[ed] . . . users into signing transactions that drain their wallets."[15]

**E. <u>Plaintiff Kim is Defrauded and his Crypto is Stolen as a Result of the Data Breach</u>**

84. On or about 2017, Plaintiff Kim purchased a hardware wallet from Ledger.

85. Kim saw advertisements from Ledger regarding its robust and security and protections and relied upon Defendant's representations.

86. In 2021, in New York City, Kim purchased a newer, updated model of the Ledger wallet – a Nano X as an upgrade to the Nano S.

87. On or about February 18, 2025, Defendant Kim was contacted by a person who purported to be from Coincover, which he represented was a department within Ledger.

88. The Ledger representative told Kim that someone located in the Netherlands had attempted to sign up for "Ledger Recover", which was purportedly a new service from Ledger, and claimed that if that person had access to this, he would have access to Kim's passphrase to access his cryptoassets.[16]

89. The Ledger representative further told Kim that he needed to address and rectify the situation immediately.

90. The Ledger representative informed Kim that one of his superiors from Ledger would contact Kim to "fix" his device.

91. On that same day, a second person contacted Kim and also purported to be a Ledger representative.

92. She asked Kim to check his email to confirm that he had received an email from Ledger and to verify that she was a legitimate Ledger representative.

---

[15]See footnote 4.
[16]https://www.cryptotimes.io/2023/10/19/ledger-ceo-announces-to-relaunch-ledger-recover/, "The cryptocurrency wallet provider Ledger is continuing with their controversial plans to introduce a seed phrase recovery feature within their hardware wallets. Pascal Gauthier, the CEO of Ledger, shared a post and announced that the company is beginning to countdown to launch Ledger Recover, which was majorly opposed by its users when announced in May… While the feature was previously introduced, Ledger received significant backlash from users, who claimed that it could be prone to attacks or might be compromised. The company then paused key recovery service and said to relaunch it with audited code."

93. Kim checked his email confirmed that he had received an email from "ledger.com", which appeared to be a legitimate email from Ledger.

94. Upon information and belief, the cybercriminals used Kim's customer contact information — which, on information and belief, originated from the Data Breach — to identify Kim as a Ledger customer, to sign him up for Ledger Recover without his authorization, and thereby to trigger the email described above; Plaintiff reserves the right to amend this allegation to identify the specific source of the compromised information following discovery of Defendant's breach-forensics and incident-response records, which are uniquely within Defendant's possession.

95. The Ledger representative then directed Kim to a website https://ledgerlivemanage.com/, which again looked like a legitimate Ledger website.

96. The Ledger representative then directed Kim to enter his confidential passphrase, claiming that Ledger needed to "reset" the device with a new passphrase that Ledger had generated.

97. The Ledger representative provided Kim the purported new passphrase and Kim wrote it down.

98. At the conclusion of the call, Kim in good faith believed that Ledger had resolved the matter and he hung up.

99. Two days later, on February 20, 2025, Kim received a call from the first Ledger representative.

100. The Ledger representative said he was calling because he had seen that the case was "unresolved" and he wanted to check on it.

101. Kim checked on his cryptoassets, totaling $1,948,074.00, and they had all been stolen.

102. The Ledger representative assured Kim that his cryptoassets were insured, but that he needed to get more information about Kim's crypto.

103. At this point, Kim became suspicious and start recording the remainder of the conversation, which was approximately 20 minutes.

104. Kim has not recovered any portion of his $1,948,074.00 in cryptoassets.

105. As a result of Defendant's gross negligence and failure to protect sensitive customer data and information, Defendant enabled the fraudulent scheme to occur.

106. As a direct and proximate result of Ledger's negligence, carelessness, and failure to safeguard and protect against the Data Breach, Kim and class members were damaged.

107. As a result of these impersonation schemes, which were made possible by Defendant's failure to safeguard and protect against the Data Breach, Plaintiffs and class members disclosed private information that the fraudsters used to steal cryptocurrency holdings.

108. Defendant's failure to prevent the Data Breach and warn its customers of the impersonation scams and risks constitutes gross negligence and violates its duty to protect sensitive customer data.

109. Defendant also has contractual and common law obligations to ensure the safety and security of the information that it requires consumers to submit as part of the sales process.

## **<u>CLASS ALLEGATIONS</u>**

110. Plaintiff brings this action on behalf of a nationwide class, defined as: all individuals in the United States whose PII, cryptoassets, cryptocurrencies, and/or crypto credentials were compromised as a result of Defendant's Data Breach and who, as a result, suffered financial loss, unauthorized transactions, or actual out-of-pocket identity-theft-mitigation expenses (the "Class").

111. In addition, and only as to the Second Cause of Action (New York General Business Law § 349, including the derivative SHIELD Act declaratory count) and the Third Cause of Action (New York General Business Law § 350), Plaintiff brings this action on behalf of a New York Sub-Class, defined as: all members of the Class whose transaction(s) with

Defendant — including the purchase of a Ledger product or service, or the creation of a Ledger account — occurred within the State of New York (the "New York Sub-Class").

112. Numerosity: The class is so numerous that joinder of all members is impracticable. The precise number of class members is unknown to Plaintiffs at this time, but is believed to be in the thousands.

113. Ascertainability: The class is readily ascertainable and identifiable. Members of the class may be identified through contact information that was breached. Members may be notified about this action by electronic mail using a form of notice customarily used in class action litigations.

114. Typicality: Plaintiff Kim's claims are typical of the claims of the class, who are similarly affected by Defendant's wrongful conduct in violation of the laws asserted herein, and he will fairly and adequately protect the interests of the class.

115. Commonality: Plaintiff Kim and the class share common questions of law and fact, including, but not limited to:

(a) Whether Defendant's conduct is an unlawful business act within the meaning of New York General Business Law § 349, et seq.;

(b) Whether Defendant's conduct is an unlawful business act within the meaning of New York General Business Law § 350, et seq.;

(c) Whether Defendant represented to Plaintiffs that it would protect their personally identifiable information;

(d) Whether Defendant owed a duty to Plaintiffs to protect their personally identifiable information;

(e) Whether Defendant breached its duty to Plaintiffs to protect their personally identifiable information;

(f) Whether Defendant's conduct cause or resulted in damages to Plaintiffs; and

(g) Whether customers were harmed by Defendant's acts or omissions.

116. Adequacy: The representative parties will fairly and adequately protect the interests of the class.

117. Predominance: Common questions of law or fact of the class predominate over those of each individual members.

118. Superiority: A class action is superior to other methods for fair and efficient adjudication of this controversy.

**DEFENDANT'S STATUTORY VIOLATIONS**

119. Defendant violated the FTC Act and guidelines, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by requiring consumers to submit their PII upon the false representation that it would safeguard their PII and subsequently failing to adequately and reasonably safeguard such PII, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

120. Defendant violated the FTC Act and guidelines, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to promptly and directly notify class members of the Data Breach after it occurred, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

121. Defendant violated the FTC Act and guidelines, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to immediately notify local law enforcement of the Data Breach after it occurred, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

122. Defendant violated the FTC Act and guidelines, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to designate a point person for the Data Breach who could provide information and advice to consumers and law enforcement entities, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

123. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by requiring consumers to submit their PII upon the false representation that it would safeguard their PII and its failure to maintain develop, implement, and maintain reasonable safeguards to protect the security, confidentiality and integrity of consumer PII, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

124. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to designate one or more of its employees to coordinate the security program, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

125. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to identify reasonably foreseeable internal and external risks, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

126. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to assess the sufficiency of safeguards to control the identified risks, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

127. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to train and manage employees in security practices and procedures, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

128. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to select service providers capable of maintaining appropriate safeguards, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

129. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to require service providers to maintain safeguards by contract, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

130. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to adjusting the security program to business changes or new circumstances, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

131. Defendant violated the SHIELD Act, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to, expeditiously and without unreasonable delay, notify every New York resident whose private information was or was reasonably believed to have been accessed or acquired by a person without valid authorization upon the company's discovery of the Data Breach, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

132. Defendant violated the SHIELD Act and guidelines, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to immediately notify the New York State Attorney General, the New York Department of State, the New York Division of State Police, and consumer reporting agencies, about the Data Breach after it occurred, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

133. Defendant violated the SHIELD Act and guidelines, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to immediately notify the New York State Attorney General, the New York Department of State, and the New York Division of State Police, as to the timing, content and distribution of the notices and approximate number of persons affected by the Data Breach and by failing to provide a copy of the template of the notice sent to affected persons, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

134. Defendant violated the SHIELD Act and guidelines, violated consumer privacy rights, and engaged in unfair and deceptive acts and practices, by failing to immediately notify consumer reporting agencies as to the timing, content and distribution of the notices and approximate number of affected persons by the Data Breach, which caused substantial injuries to numerous consumers, including Plaintiff and the class members.

## DAMAGES

135. As a result of the foregoing, Plaintiff Kim was damaged, at a minimum, in the approximate amount of $2,000,000, exclusive of interest and costs.

136. Overall collective damages to the Class can reasonably be expected to meet or exceed five hundred million dollars ($500,000,000.00), consistent with the illustrative scenarios below, which — depending on the percentage of the Class affected and the severity of individual class members' losses — could rage range from as little as $500 million to billions of dollars in the aggregate.

137. Ledger has sold 7 million units and has customers in 180 different countries.

138. If even a small percentage, or 3%, of Ledger's customers who purchased those 7 million units were affected by the Data Breach, that would be 210,000 consumers who were damaged as a direct and proximate result of Defendant's improper, negligent, and reckless conduct.

139. If a small percentage of the 210,000 consumers affected, for e.g., 10%, experienced financial losses of just $20,000, which is far below the $2,000,000 that Plaintiff Kim experienced, the calculated damages would be $420 Million, exclusive of interest and costs.

140. If that same 210,000 consumers experienced financial losses similar to Plaintiff Kim in the amount of $2,000,000, the calculated damages would be $420 Billion, exclusive of interest and costs.

## AS AND FOR A FIRST CAUSE OF ACTION
## NEW YORK GENERAL BUSINESS LAW § 349

*(Deceptive Acts and Practices)*

141. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if more fully set forth at length herein.

142. Defendant's acts, practices, and services were consumer-oriented.

143. Defendant engaged in deceptive and misleading acts, including:

(a) Falsely representing that its services, networks, and platforms were robust and secure;

(b) Falsely representing that it had policies, procedures, programs, and regular trainings that were implemented and audited to ensure the safety and confidentiality of the PII of the Plaintiffs and the class members;

(c) Failing to implement and maintain reasonable security and privacy measures to protect the PII of Plaintiffs and the class members, which was a direct and proximate cause of the Data Breach;

(d) Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity breaches and incidents, which was a direct and proximate cause of the Data Breach;

(e) Failing to comply with common law and statutory duties pertaining to the security and privacy of the PII of Plaintiffs and the class members;

(f) Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs and the class members, including by implementing and maintaining reasonable security measures; and

(g) Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure the PII of Plaintiffs and the class members.

144. Defendant's acts, representations, and advertisements were materially misleading to a reasonable consumer.

145. As a result of the foregoing, Plaintiffs as a class suffered actual injury as a result of Defendant's deceptive practices in an amount to be determined by the Court, but in no event less than five hundred million ($500,000,000.00) dollars.

146. As a result of the foregoing, Plaintiffs are also entitled to an award of treble damages and reimbursement of their attorneys' fees.

**AS AND FOR A SECOND CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**NEW YORK GENERAL BUSINESS LAW § 349**
*(Deceptive Acts and Practices)*

147. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if more fully set forth at length herein.

148. Defendant violated the SHIELD Act as alleged herein.

149. Defendant is therefore deemed, by operation of law and statute, to have violated New York General Business Law § 349.

150. As a result of the foregoing, Plaintiffs are entitled to a judgment from this Court declaring that Defendant has violated the SHIELD Act and New York General Business Law § 349.

**AS AND FOR A THIRD CAUSE OF ACTION**
**NEW YORK GENERAL BUSINESS LAW § 350**
*(False Advertising)*

151. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if more fully set forth at length herein.

152. Defendant's acts, practices, and services were consumer-oriented.

153. Defendant engaged in deceptive and misleading acts and advertising by:

(a) Falsely advertising that its services, networks, and platforms were robust and secure;

(b) Falsely advertising that it had policies, procedures, programs, and regular trainings that were implemented and audited to ensure the safety and confidentiality of the PII of the Plaintiffs and the class members;

(c) Failing to implement and maintain reasonable security and privacy measures to protect the PII of Plaintiffs and the class members, which was a direct and proximate cause of the Data Breach;

(d) Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity breaches and incidents, which was a direct and proximate cause of the Data Breach;

(e) Failing to comply with common law and statutory duties pertaining to the security and privacy of the PII of Plaintiffs and the class members;

(f) Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs and the class members, including by implementing and maintaining reasonable security measures; and

(g) Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure the PII of Plaintiffs and the class members.

154. Defendant's acts, representations, and advertisements were materially misleading to a reasonable consumer.

155. As a result of the foregoing, Plaintiffs as a class suffered actual injury as a result of Defendant's deceptive practices in an amount to be determined by the Court, but in no event less than five hundred million ($500,000,000.00) dollars.

156. As a result of the foregoing, Plaintiffs are also entitled to an award of treble damages and reimbursement of their attorneys' fees.

## <u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
## NEGLIGENCE

157. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if more fully set forth at length herein.

158. Defendant owed Plaintiffs a duty to exercise reasonable care in protecting their personal and financial information. This duty arose independently of, and exists regardless of, any contractual relationship between the parties; it arose instead from Defendant's voluntary collection, custody, and control of Plaintiffs' sensitive PII and cryptocurrency security data, and from the foreseeability of harm to Plaintiffs in the event that data or Defendant's software-distribution infrastructure were compromised.

159. Defendant breached this duty by failing to implement reasonable safeguards that guarded against and avoided the Data Breach.

160. As a direct and proximate result of Defendant's breach of its duty, the class of Plaintiffs suffered losses, including stolen PII, stolen cryptoassets, and costs related to monitoring and remediating the harm, in an amount to be determined by the Court, but in no event less than five hundred million ($500,000,000.00) dollars.

## AS AND FOR A FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

161. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if more fully set forth at length herein.

162. Defendant and Plaintiffs had a special relationship that imposed upon Defendant a duty to impart accurate and correct information to Plaintiffs, in that Defendant held itself out as possessing unique and specialized expertise in cryptocurrency security — as alleged in ¶¶49–54 — that ordinary consumers could not independently verify; Defendant knew that Plaintiffs and the class would rely on Defendant's specific representations regarding its security practices and incident-response procedures in deciding to purchase and continue using Defendant's hardware

wallets and to entrust Defendant with their PII; and that reliance was of a character beyond the reliance inherent in an ordinary arm's-length consumer transaction.

163. Defendant failed to impart and relay accurate and correct information to Plaintiffs and instead the information from Defendant was inaccurate and incorrect.

164. Plaintiffs reasonably relied upon the information imparted by Defendant, to their detriment.

165. As a result of the foregoing, the class of Plaintiffs suffered damages in an amount to be determined by the Court, but in no event less than five hundred million ($500,000,000.00) dollars.

## AS AND FOR A SIXTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL

166. Pleaded in the alternative to the First through Fifth Causes of Action, and only to the extent any contract between the parties is found unenforceable, inapplicable, or not to cover the conduct alleged herein:

167. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if more fully set forth at length herein.

168. Defendant made multiple and repeated clear and unambiguous promises to Plaintiffs that it would responsibly collect, maintain, and secure their personal and financial information.

169. Plaintiffs reasonably and foreseeably relied upon Defendant's promises, to their detriment.

170. As a result of Plaintiffs' reliance and the foregoing, the class of Plaintiffs suffered damages in an amount to be determined by the Court, but in no event less than five hundred million ($500,000,000.00) dollars.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

171. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if more fully set forth at length herein.

172. Ledger enters into agreements with its customers regarding the services that Ledger will provide to those customers on the promise that it will keep PII of its customers safe and secure.

173. Ledger enters into agreements with its customers on the promise that it is a secure repository for PII.

174. Ledger has an obligation to act as responsible stewards and guardians of the confidential information and the digital cryptoassets of their customers.

175. Ledger has an obligation to refrain from doing anything that would have the effect of destroying or injuring the right of the their customers to receive the fruits of the contract. That contract is comprised of the Ledger General Sales Terms and Conditions and the Ledger Privacy Policy identified in ¶45, under which Ledger specifically undertook — as alleged in ¶54 — to "implement all technical and organisational measures [it] deem[s] necessary to safeguard [customer] Data," including through role-based authentication, two-factor authentication for authorized contributors, and continuous system monitoring; the benefit of that specific undertaking is what Ledger's conduct alleged herein withheld from Plaintiffs and the class.

176. Ledger breached its obligations by failing to devise and implement policies that would immediately discontinue the access of former employees to Ledgers' confidential information, which includes but is not limited to the personally identifiable information of Ledger's customers.

177. Ledger breached its obligations by failing to maintain secure systems it purported to have and maintain, which lured customers into contract under false pretenses.

178. Ledger never intended to implement the type of security and protections it purported to have and maintain despite its marketing materials indicating otherwise, which contain promises Ledger was to carry out and that form the basis for the agreement with its customers.

179. Ledger's actions resulted in a withholding of the benefits of the agreement from the Plaintiffs.

180. As a result of the foregoing, the class of Plaintiffs suffered damages in an amount to be determined by the Court, but in no event less than five hundred million ($500,000,000.00) dollars.

## JURY TRIAL DEMANDED

181. Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

WHEREFORE, Plaintiff, individually and on behalf of the class, respectfully requests judgment against Defendant and requests that this Court:

(a) Issue a judgment declaring that Defendant has violated the SHIELD Act resulting in damages to Plaintiffs in an amount to be determined at trial but in no event less than five hundred million ($500,000,000.00) dollars; and

(b) Issue a judgment declaring that Defendant has violated New York General Business Law § 349 resulting in damages to Plaintiffs in an amount to be determined at trial but in no event less than five hundred million ($500,000,000.00) dollars; and

(c) Issue a judgment declaring that Defendant has violated New York General Business Law § 350 resulting in damages to Plaintiffs in an amount to be determined at trial but in no event less than five hundred million ($500,000,000.00) dollars; and

(d) Issue a judgment declaring that Defendant has acted with negligence, gross negligence, reckless, willful and/or wanton conduct resulting in

damages to Plaintiffs in an amount to be determined at trial but in no event less than five hundred million ($500,000,000.00) dollars; and

(e) Issue a judgment declaring that Defendant is liable to Plaintiffs for negligent misrepresentations resulting in damages to Plaintiffs in an amount to be determined at trial but in no event less than five hundred million ($500,000,000.00) dollars; and

(f) Issue a judgment declaring that Defendant is liable to Plaintiffs for Defendant's breach of the implied covenant of good faith and fair dealing, resulting in damages to Plaintiffs in an amount to be determined at trial but in no event less than five hundred million ($500,000,000.00) dollars; and,

(g) An award of actual, compensatory, statutory, treble, and punitive damages on each of Plaintiffs' causes of action; and

(h) Award attorneys' fees, costs, and expenses; and

(i) Grant such other relief as this Court deems just and proper.

Dated: New York, New York
August 27, 2026

**ERVIN COHEN & JESSUP, LLP**
*Attorneys for Plaintiffs*

Matthew S. Blum, Esq.
Sarah E. Silbowitz, Esq.
1185 Avenue of the Americas, 3rd Floor
New York, NY 10036
(212) 224-0644
MBlum@ECJLaw.com
SSilbowitz@ECJLaw.com